Good morning. I'd like to reserve two minutes for rebuttal, please, on the claim. Okay. My name is Marie Andrade. I represent the plaintiff in this matter, Mr. Arteaga, a United States citizen who was deported in 2007. Resolution of this case at this early stage of proceedings on a 12b1 motion is inappropriate, and it's inappropriate because of the specific allegations that my client made, particularly that when ICE began its initial questioning, whatever probable cause they might have had to begin that questioning, it was called into question the moment that they received some very critical information, and they did nothing in response to that. The critical information was that they learned that my client's mother became a United States citizen  And upon learning that fact, we plead, it would have been a basic application, a basic asking one question to my client, did you live with your mother when you were a minor at that time, to conclusively establish that he had become a United States citizen by operation of law. Is that the only additional fact they needed? That's the only additional fact they needed. Now, there was something in the pleadings about how the face of the equivalent of the police report, the record of sworn statement that the ICE officers prepared, did not include, like, the effective date of the, of when the act went into place. But that's the only thing that would have needed. The only other thing they had to do was do some very simple math to determine that my client was under 18 on the date that his mother became a lawful permanent, excuse me, a U.S. citizen. And so what we're alleging not, it's not an investigation question. The question is, did they have any authority upon learning that information to ignore it, to not ascertain or determine whether they had the jurisdictional element that gave them the authority to act? Now, what if the client gives them that information and then says, but I am not a United States citizen. That's a what if. I'm not sure that's what he said. But what if he says, here's this information. I am not a U.S. citizen. Not relevant. And I'll tell you why. Because regardless of, you know, like, who bears the burden of proving citizenship or whatever, he says two things. One is the, it doesn't relieve the essential prosecutor of the case of, to make sure that they have probable cause on which to act. So much like a police officer who thinks they have probable cause who receives information that calls into question their ability, their authority to act. And here it's like a jurisdictional authority, whether the individual is an alien. They had to, that burden is not relieved by an admission. And the second reason is that, you know, there are cases that the court. Why are those things different? Let's take your analogy about a police officer developing probable cause. If a police officer comes up to me and says, you know, I'm looking for the murderer of John Smith. And I say, well, I am the murderer of John Smith. I killed him yesterday. I think we would all agree that a police officer has probable cause to make an arrest. They have probable cause to make the arrest, but the, like in a prosecutor or a board or a court wouldn't be able to accept an admission to relieve an obligation to prove the essential elements of an offense had been actually been committed. And we've cited a case, I think it's Mahundano, if I get it right, in the materials. But here's the question. I think Judge Tiger and I are kind of after the same point. I understand the obligation on the part of the United States. If it's given information that says, if you sort of add two plus two makes four, you determine that the man is a citizen, or you're given almost all the information and all you need is a very small question to be answered, which this person can answer, then we know he's a U.S. citizen. And maybe that's a pretty strong position for your client. But what if, while the government officials are being given this information, your client also says, I am not a United States citizen. That says unambiguously, maybe mistakenly, but unambiguously what the answer to that other small question would have been. That still doesn't relieve the immigration officer from an independent duty to ascertain, as a matter of law, whether or not that individual is an alien or isn't. And so far you've not picked me up on this one. I'm not aware that at the time of the arrest, and it'll actually fairly fall far into the proceedings, that your client ever said, I am not a U.S. citizen. What he said is, I'm a Mexican citizen. Now, there's dual citizenship. So saying I'm a Mexican citizen does not in itself negate U.S. citizenship. Yes, Your Honor. And also, you know, the timeline is particularly critical here. So there was on the 27th of November, there was the initial discussion, and where we understand that our client, you know, said my mom's, or they discovered that the mother had become a citizen when he was a minor. Three days pass before the charging document is served, before they actually refer the individual to proceedings. And it's alleged, although it's not in the excerpt of record that I could find, it's alleged that he signed a record of sworn statement in making an admission at that time. But so that's the only time where purportedly, but again, there's not. Well, there's a stipulation later on that he's not a U.S. citizen. I mean, my understanding of immigration law is there had to be a record of sworn statement somewhere with a stipulation, but that would have come three days after they had learned the critical information. But you're not contesting so much the arrest. You're contesting the deportation. So then the stipulation is entered before the deportation. Well, we're contesting the arrest, the detention for the three days before that the notice to appear was served, the charging document, and the five days after that before he was actually deported, and the actual deportation. And that was, as a side note, something that the district court failed to do in terms of the proper analysis of how the discretionary function exception applies. We know it's very clear that it must be analyzed with regard to each challenge conduct, and the district court here did not do an independent analysis as to the arrest, the detention, and the removal. So I'd like to, you know, whatever probable cause that the immigration officers believed that they had at the time that they brought, you know, our client in for initial questioning, first we allege that that dissipated upon learning this information, and that's the fact that probable cause can dissipate, or that a reasonable officer, you know, would undertake additional investigation upon learning new information before making an arrest is, we have a number of cases for that proposition. You know, immigration law is, as I'm sure you know better than we do even, somewhat complicated. And the criteria for citizenship, depending on the situation, can be very complicated. How much immigration law are these officials supposed to carry around in their heads? The binnable, well, I don't disagree that it can be complicated. We did plead at paragraph two of our complaint that this is a basic application. This particular law is very easy. It was neither too old, nor too old to have been forgotten, nor too new of a law to have not had training on. But there is, we cite the detention and deportation officers' field manual in our rebuttal. I can give you the citation, but it indicates there that you will be, officer, expected to carry out legal research. You'll be expected to carry out factual research. And we would submit that where the only source of their authority to act is with regard to noncitizens, that as a minimal threshold matter, they ought to at least zealously and diligently investigate whether they have authority to act on these facts here that was met, where it was a simple application, as they are in trying to deport undocumented immigrants. I'd like to just turn, if I might, before the end of this part of your time, to the second prong of the Berkovitz test on the DFE. And that is the public policy. It's hard, it would be very hard to identify a public policy of the United States that could be advanced by allowing immigration officers to actually contemplate whether it's okay to arrest, detain, or deport a U.S. citizen. You know, I think Caban, the Second Circuit case that we cite, talks about it, you know, applies it fairly well by saying, look, it doesn't, the DFE, the public policy analysis is really to like avoid, you know, avoid courts coming in and like messing up what Congress, you know, kind of wanted to promote as a policy or what are some legitimate policy decisions. Well, we know that that's not what we're asking for here because Congress already spoke. It spoke through 18 U.S.C. 4001 when it said, hey, ICE officers, you can arrest and deport and do all this stuff, but you can't do that to a U.S. citizen. And they put in the Immigration and Nationality Act, their powers, their authority to act, the jurisdictional authority is limited to U.S. citizens. So the only other ‑‑ the District Judge was that it's a matter of discretion and, therefore, falls within the discretionary function exception to the Federal Tort Claims Act, the amount of resources to be put into investigation. Now, much of what you've said implicitly addresses that, but could you address it specifically, why this doesn't fall within the discretionary function exception for that reason? Sure. So this Court has already observed in Winstead that, look, every government action is going to involve some amount of budgetary expenditure. I mean, that's ‑‑ when the government acts, just spend money. And if we're going to say that every act of the government, simply because they have to make budgetary choices, becomes discretionary, well, then that's just going to swallow the exception in total. The other here is that, you know, it helps us kind of figure out the mandatory nature of the duty with regard to the money issue if we look at a case like O'Toole. So there the Board of Indian Affairs had acquired a piece of land and they had a ditch there, and they didn't maintain it, and the down road properties were like, hey, you know, we're suffering damage. And there the Court said, look, government, you may have other things you want to spend your money on. We get that. But you don't have discretion to just, like, not maintain it at all. So here we're not, you know, we're ‑‑ and we're not saying that maybe the level, the inquiry that we think was triggered by the learning of the mother's naturalization date is going to be present in every case. I mean, on these ‑‑ in this case, there was, you know, there was really no ‑‑ not going to be an expenditure of resources. So we're not ‑‑ that is beyond something that's reasonable. So we're not arguing here for a bright line rule. We're arguing simply that we get a chance to develop the record and really get into what is, you know, what is it that the ICE officers knew? What steps did they take? Maybe they didn't take any. The last point on the public policy bit, which the district court mentioned, although it's not advanced, as I noted, in the government's briefing, was the suggestion like, you know, immigration matters involve national security and they involve sovereignty, and so we just let the government do whatever they want. Well, those cases the district court cited and the rationale underlying them really is, you know, the product of an assumption that the people involved in those cases were not United States citizens. So the type of concerns that were advanced there in the district court cases that they cite are simply not applicable. All right. Unless there's further questions, I think I will ‑‑ I will hand it to you again. Good morning, and may it please the court. Joseph Busa on behalf of the United States. And I think I'd like to begin this morning by discussing all the judgment calls and matter of choice that the immigration officers here faced when they investigated Mr. Artiago Ruiz's citizenship and removability. So to begin with, the record reveals that they queried four different government databases and assembled quite a bit of information about this individual, including his foreign birth to noncitizen parents at the time, his later conversion to a lawful permanent resident, i.e., not a citizen, and the lack of any further documentation of the individual having obtained citizenship. At each step of those procedures, the officers had discretion about which databases to query, what searches to use, what information to rely on, and when to think, no, I think I need to dig a little deeper on this. They then had to face the question of what to do when they interviewed the plaintiff, the target of the investigation. And when he says, I stipulate ‑‑ discretionary function exception and the duty to investigate, why doesn't this case come within the exception to the exception in subsection H? Ah. Your Honor, I believe this Court resolved in a case called Gasho, G-A-S-H-O, in 1994 that the law enforcement per viso to the intentional torts exception does not subtract from the discretionary function exception in 2680A. Well, I've read Gasho, and I'm not sure. I think that's an overreading of it. We clearly have to read all sections of the statute as applicable. And by its own terms, subsection says, subsection H says that with regard to acts or omissions of investigative or law enforcement officers, the provision of this chapter shall apply to any claim, da, da, da. So that's the law. We can't, we obviously cannot ignore that law. So how does that law apply to this case? Well, Your Honor, I think that plaintiff would have had to invoke that law in order to require this Court to address it. So I would think it would be forfeited and you wouldn't need to address it in this case. But again, we think that Gasho settles this. We think that 2680H and 2680A both have independent force. So something falls. So I've got Gasho in front of me. What part of Gasho, in your view, settles that question? I have to apologize, Your Honor. I don't have that case here in front of me at the moment. But having read it recently, I do believe it settles the question that if 2680A applies, i.e., if discretionary function exception applies, then whether or not 2680H also applies, there is no viable tort claim. But again, I would just emphasize that plaintiffs have not raised this argument, so I don't think you would need to address it here. And if you were to seek to address it, I actually would appreciate an opportunity to address that issue in, say, a short letter brief. Well, if we were to rely on that, I think both sides should be allowed supplemental briefing. I get that. But in any event, Your Honor, I do believe that Gasho settles this question. But just sort of to go back to the discretionary function exception and why it covers these types of claims, once these immigration officers interviewed Mr. Arteaga-Ruiz and he stipulates to being a removable noncitizen, they have a lot of choices to make. Do they? Well, did he say that he was a noncitizen? And at what point do we get some affirmative statement either by him or by his lawyers that he's a noncitizen? What I get at the beginning is I'm a citizen of Mexico. And, of course, dual citizenship is a possibility. So saying I'm a citizen of Mexico does not negate the possibility that I'm also a citizen of the United States. Your Honor, I believe he stipulated to being a removable noncitizen on page 215 of the excerpt of record. I think that's the record of the stipulation. That's a document that appears to be dated November 27th, which I think is the day that he was first taken into custody. But in any event, there's a lot of discretionary determinations. So give me that one more time just to make sure I'm on the same page with you. I believe we're at excerpt of record 215, which at the top is dated November 27th. This is a list of stipulations. And I think that this is the record documenting the stipulation to being a removable noncitizen, Your Honor. But I believe in any event, there are. Okay. So I've got this. The date is November 27. And it says the service alleges that you are not a citizen. And then at the bottom it says all admitted in stipulations is Exhibit 4, RCM. Who's RCM? I believe those are the initials of the immigration officer at issue here, Your Honor, but I'm not sure of that fact. That's correct. So I'm trying to figure out, okay, that's not quite a stipulation signed either by the client or by his lawyer. Help me out. So when do I get it? I'm sorry, Your Honor. I believe that these A's next to each number are his sort of stipulation. Maybe I'm a little unclear on the allegations, but I believe he had initial stipulation. So the A is his. I got it. Okay. In any event, Your Honor, I don't think that this issue is determinative of this case because even without the stipulation, there would have been quite a bit of discretion in these officers whether to negate the possibility of derivative citizenship when he appears to be, you know, due to his foreign birth to noncitizens, to be a removable noncitizen. The strongest I can make it in his favor is that he says I'm a Mexican citizen and he makes no claim whatsoever to U.S. citizenship. And a reasonable immigration officer at that point I think probably is entitled to infer non-U.S. citizenship. Yeah. I think that's right, Your Honor. And then I think it's also important just to note that the immigration investigation is not the last step of any of these determinations. All of that information from the investigation, I believe, is then presented to an immigration judge who makes another determination. Is this person a removable noncitizen? That same person has all of the same information. The immigration judge came to the same reasonable determination. And so the immigration judge is not going to perform further investigation. There's not an investigatory function there as there was with regard to these officers, right? Your Honor, my understanding, and this goes beyond the record somewhat, is that immigration judges do have the ability to talk with the person who's presented in front of them in one of these final removal proceedings. And they can ask further follow-up questions. But, again, I don't think that's in the record. So you shouldn't be too. There's some obligation for the I.J. to make some inquiry. But in any event, Your Honor, I think the larger point is there's a number of discretionary determinations involving an element of judgment or choice all along the way here. And plaintiff has not identified a specific law or policy that would have subtracted that discretion at any point. But the simplest argument on the other side is if the immigration officer or anyone connected with the United States government had asked one question, and the question had been answered truthfully, and he had the knowledge within his own control, that would have demonstrated he was a citizen. That's not much of an investigation. That's a simple question. The answer is yes or no. It would have taken less than 30 seconds. And you say that's an investigation that is a matter of policy and discretion the United States government is not required to undertake. Your Honor, just to be clear. I think that's your position. So it is. And I just want to spin out why we think that's a reasonable position to take and the correct position. Okay. So, first, I don't think it's technically true there's just one question to ask. I think there's also the question of presence in the United States between the effective date of this statute and when he turned 18. It certainly may be true that he was in the United States. In fact, it is true in this case. He's attained the certification. But it's not obvious from the record that he was. So there are two questions. Indeed, Your Honor. And any time an investigating official in a case like this is presented with this kind of situation, they're presented with two options about how to best give effect to the statute. One, do we negate the possibility of derivative citizenship in a case like this and avoid a very sad case of mutual mistake like we have here? Or do I turn my attention to a disputed case of removability and try to make sure that someone who's claiming citizenship is indeed a citizen? Or do I go out and try to target higher priority cases to bring them into the system? Those are the kind of choices that are imbued with public policy decision-making like this court. I would be very sympathetic to that question, to that approach. And as stated by you, I am sympathetic to it, except that when you say time away from this case, time spent on this case is time taken away from other cases, the amount of time we're talking about, I guess we're doing two questions, I'll say less than a minute. Your Honor, so we waste minutes all the time. That may be true, Your Honor. I think that it may not be the case that those simple questions where they answered would then establish derivative citizenship. You, of course, would then have to track down whether all of that is true. There'd be fewer interviews involved. There'd be quite a bit more time spent. And I just want to highlight when Mr. Arteaga-Ruiz filed his form asking for recognition of his derivative citizenship, he filed quite a bit more information than we would have obtained even if these ICE officers had asked those two questions. And I also want to highlight that this court, in a case called Alfrey, cited in our briefs, that any federal criminal investigation or quasi-criminal investigation is imbued with the kind of policy choices that the discretionary function exception is intended to protect. And we think that an investigation into citizenship and removability is the kind of quasi-criminal investigation that the Alfrey court was imagining. So we do think that on step two of the Berkovits test that we ought to prevail. This is the kind of discretionary choices that Congress meant to protect. As Judge Fletcher explored with Ms. Andrade, you state in your brief that the policy choices that are to be made here are officers' inevitable choices about how to allocate scarce resources in light of enforcement priorities. And it was on that basis that the district court rested its decision. And the question that I have is, why doesn't the exception swallow the rule? Aren't all, particularly given Judge Fletcher's comments about how low the potential opportunity cost of time here was, don't all federal employees, including both you and me probably, make decisions every day that have some effect on resource allocation? I think that might be true. But again, I don't think you're writing on a blank slate here. Alfrey squarely says that every federal criminal investigation and quasi-criminal investigation satisfies Berkovits prong two. And more to the point, actually, just on the merits of what we're really talking about here, we're not talking about resource allocation simpliciter. We're talking about resource allocation in order to give effect to the values that the statute protects. Is it more important to avoid the possibility of mutual mistake, a very sad case of mutual mistake, when someone is not claiming U.S. citizenship, or is it more important to turn around and maybe spend some time on a case in which someone is claiming U.S. citizenship and fully adjudicate those claims? But the short answer to the two questions would have shown the entitlement to U.S. citizenship, assuming that the answers were truthful. So that immediately puts him into the category of someone claiming U.S. citizenship, not because he knows about it, but because as soon as those answers come forward, the officer, if he knows the law, says, well, if that's true, you are a citizen and you're entitled to claim it. So once that happens, he's immediately into what you call the favored category. And at that point, we can spend the time on it. So we can push it into the favored category very quickly. That may be true in some hypothetical case, Your Honor, but what remains the case is that in this case, we do have a case of mutual mistake, and Mr. Arteaga Ruiz was not claiming United States citizenship. And at that point, if you do that — But as soon as he provided the answer to those two questions, the officer, well-informed as to the law, would have said, well, if that's true, you're a citizen. And I think he wouldn't have said, well, in that case, I don't claim it. I doubt that would have been his answer. Oh, I think that's right, Your Honor. And so that gets back to the question on step one of Berkovitz. Was there a specific mandatory duty prescribing a course of action for that employee to follow to ask that question? And plaintiffs identified no such thing. If there are no further questions, we simply ask that you affirm. Thank you. Okay. Thank you. You've saved some time. Thank you. So I'm going to add a number of things for clarity of the record in part. First, this was a case of a stipulated removal order, so the individual was not brought before the immigration judge. That's not done in stipulated removal orders. They simply review the papers. The second is that not all the information that the ICE officers obtained, particularly the record of sworn statement, would have been in front of the judge. The officer's field manual that we mentioned earlier at Chapter 41.1 indicates that the record of proceedings does not include the record of sworn statement, the I-213 form. The other, I mean, and probably really the most important thing here is, you know, we're not saying the investigation was deficient. We're saying there was no investigation. That's what we pled. And it would be much harder to come up and articulate a public policy that would allow no investigation. And we're talking about after they learned the critical information. Given that, why doesn't this case fall within subsection H? Are you familiar with subsection H? I am, but, you know, to be honest, Your Honor, the amicus brief adjusted a bit, but I had not prepared for a discussion here. I am privy to the law enforcement proviso, but my understanding is that the whole purpose of that was to make sure that if there was a tort alleged in the carrying out of a duty of an officer in this context, that there would be a remedy available for them. And I believe that Caban is the case that discerns that, but I apologize, and I'm not better prepared to discuss that. Caban's the Second Circuit case, right? Yes, yes, Your Honor. So the short answer is you were really not paying any attention to subsection H until you got the amicus brief? Well, I didn't pay as much attention to it. I mean, we had read the case law. We had understood that the law enforcement proviso was in part in place because they wanted to be able to provide remedies. Were you the lawyer in the district judge, in front of the district court? I was. And did subsection H come up in front of the district court? It did not, Your Honor. Okay. The other thing, in a point of clarity, in terms of like when this allegation or supposed stipulation was made, ER-215 is what happens in the notice to appears first, you get the allegations, which is the thing that was printed on the 27th. And then on the 30th, there was later a signature by our client for the first time indicating that he, you know, was going to proceed with a stipulated removal order. And the letters, the RCM on there is, you know, from the initials is by a deportation officer, and they indicate that those letters were put on there and the handwriting was put on there not until November 30th. I think that becomes clear. I don't have it in front of me. But if you go to the next page of the record, it has that November 30th date, and I think what you're stating is the reasonable inference. Yes, Your Honor. Thank you. And last, I just, you know, it's really difficult to talk about this case as if it's a mutual mistake. I mean, we're talking about an individual who's in a detained setting who's talking with trained, you know, immigration officers who go to an academy, who presumably are trained at some point about, you know, who they have authority to act upon and who they don't. My client doesn't have any of that training. And who is in the better position to know? The people who are taking action that is prescribed, prescribed action by statute in terms of the limits of their authority, or an individual layperson who hasn't had any, any training? It's hard, it's hard to accept a suggestion that it was a mutual mistake. We ask that the Court allow this case to deny or, excuse me, reverse the district court's finding, that it issue a decision that lays, that identifies the proper way in which to carry out this analysis, the DFE analysis, so we're not back here on something like that again, and that would provide my client the chance to really develop the record onto all sorts of facts that we're interested in, including, you know, what were the circumstances of that admission? You know, we haven't had the opportunity to even look into that. Thank you, Your Honor. Roberts. Thank both sides for your arguments, helpful arguments. The case, Artiego-Ruiz v. United States, submitted for decision. And that completes our argument for this morning, and we are now adjourned.
judges: Fernandez, W. Fletcher, Tigar